IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| AFTON DALE CALLAHAN,<br><br>Plaintiff, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| MILLARD COUNTY; THE CENTRAL UTAH NARCOTICS TASK FORCE; SEVIER COUNTY; SANPETE COUNTY; PIUTE COUNTY; MT. PLEASANT CITY; WAYNE COUNTY; RICHFIELD CITY; SALINA CITY; GUNNISON CITY; EPHRAIM CITY; CORDELL PEARSON in his official and individual capacity; MARTY GLEAVE, in his official and individual capacity; CLARK THOMAS, in his official and individual capacity; DWIGHT JENKINS, in his official and individual capacity; and JOHN DOE I-IX in their official and individual capacities,<br><br>Defendants. | Case No. 2:04-CV-00952 |

This is a § 1983 action in which plaintiff Afton Callahan alleges the named defendants

violated his Fourth Amendment rights by a warrantless entry into his home.  Both sides have

moved for summary judgment.  The court finds it possible that the entry into the home was justified under the consent-once-removed doctrine, as a confidential information who had been given access to the home had authority to invite law enforcement officers into the home as well. Because this legal doctrine possibly justified the officers' actions, they did not violate clearly-established Fourth Amendment rights.  Accordingly, they are entitled to qualified immunity.  The legal entities who supervised the law enforcement officers are also entitled to judgment in their favors.  Accordingly, the court GRANTS the defendants' motion for summary judgment [#61] with respect to Mr. Callahan's federal claims and dismisses his state claims without prejudice. The court DENIES Mr. Callahan's motion for partial summary judgment [#52].

## BACKGROUND

For the purposes of these competing motions for summary judgment, the court finds the following facts.  The Central Utah Narcotics Task Force is charged with investigating illegal drug use and sales in Central Utah.  The Task Force regularly relies on confidential informants to achieve its goal of eradicating the sale and use of illicit drugs.  Brian Bartholomew agreed to assist the Task Force as one of those confidential informants after being charged with possession of methamphetamine.  On March 19, 2002, Mr. Bartholomew encountered plaintiff Afton Callahan at a gas station in Fillmore where the two had a casual conversation.  Mr. Bartholomew then contacted Officer Jeffrey Whatcott of the Task Force and informed him that Mr. Callahan would have methamphetamine to sell later that day.  Officer Whatcott instructed him to call back later if he had any more information, and Mr. Bartholomew promised to do so.  Mr. Bartholomew left work around 5:00 p.m. without further talking to Mr. Callahan or any

subsequent discussions with Officer Whatcott.

Mr. Bartholomew then proceeded to buy some beer and drink between six to eight beers in three hours.  Around 8:00 p.m., he visited Mr. Callahan's home, determining that methamphetamine was in fact available.  Mr. Bartholomew also ingested or tasted a sample of the methamphetamine.  He then made further arrangements to make a purchase that night at Mr. Callahan's house.  Mr. Bartholomew left the house under the auspices of procuring funds and contacted Officer Whatcott.  He reported that he set up a deal between him and Mr. Callahan, and the Task Force arranged to meet further with Mr. Bartholomew.

At 9:00 p.m., Mr. Bartholomew met with members of the Task Force and briefed them on his conversations with Mr. Callahan.  He indicated that he could likely purchase a gram of methamphetamine for $100 from Mr. Callahan at his house.  The Task Force members also discovered that Mr. Bartholomew had been drinking heavily.  Officer Whatcott consequently monitored Mr. Bartholomew for several hours, urging him to drink numerous cups of coffee until the Task Force could ensure his competency to complete the job.  Mr. Bartholomew did not inform the Task Force, however, of his indiscretions with methamphetamine during his visit to Mr. Callahan's house.  Once the Task Force determined Mr. Bartholomew's readiness for the task, they searched him for drugs and equipped him with a wire and a transmitter.  They also gave him a marked $100 bill, and xeroxed that bill as well.  The Task Force then discussed the procedures of the arranged buy with Mr. Bartholomew, indicating that he should proceed with the buy at 11:00 p.m.  The Task Force determined that Mr. Bartholomew would  give the Task Force officers a pre-determined signal once he completed the buy.  This signal "was to act like he

was going to play the drums that were on the porch of the residence."[1]

The Task Force then transported Mr. Bartholomew to Mr. Callahan's trailer and he gained entrance to the house through the attached porch door after being let in by Mr. Callahan's daughter. The house entrance included an enclosed wooden porch attached to the front of Mr. Callahan's house. The porch had a separate door to the outside, and contained items such as a drum set, washer and dryer, a garbage bag, and shelves. There was also a two-inch crack between the floor of the porch and the interior door of the trailer house. Once Mr. Bartholomew entered the house, the Task Force monitored the conversation through the wire on his person.

Once inside, Mr. Bartholomew asked Mr. Callahan for some methamphetamine, and they completed the deal. Mr. Callahan removed a large baggie from his kitchen freezer, unrolled it, and provided a number of smaller baggies of methamphetamine for Mr. Bartholomew to purchase. They then exchanged the marked $100 bill for one bag of methamphetamine. Mr. Bartholomew then left the house and entered the porch area together with Mr. Callahan and a third person. As the three men entered the porch area, Mr. Bartholomew "mentioned that [all three of them] should play the drums."[2] The reference to the drums (even though Mr. Bartholomew did not actually play the drums) signaled to the Task Force that the deal had been completed. "When [Officer Whatcott] heard [Mr. Bartholomew] say something about playing on the drums . . . [saying something about how Mr. Bartholomew] wanted to play drums on the porch . . . is when [Officer Whatcott] advised the other officers the [methamphetamine] deal had

---

[1] *State v. Callahan*, Jury Trial Transcript I, at 72 (Aug. 5, 2002).

[2] *State v. Callahan*, Jury Trial Transcript II, at 19-21 (Aug. 6, 2002).

been made."[3]  While the Task Force defendants concede lack of clarity of some of the

transmissions over the wire, Officer Whatcott testified that he recognized the prearranged signal.

He then signaled the other Task Force members that the deal had been completed and gave the

"okay" to enter the trailer house.

      The Task Force officers entered through the porch door and ordered Mr. Bartholomew

and another individual to lay on the ground.  Mr. Callahan observed the police from inside the

house portion, just outside of the porch enclosure, and proceeded to step outside onto the porch at

that moment.  Additionally, at that moment, the other person with Mr. Bartholomew reached for

one of the officer's flashlight that happened to be attached to the end of the officer's weapon.

Officers from the Task Force observed Mr. Callahan drop a plastic bag into the porch area which

they later confirmed contained methamphetamine.  The Task Force officers ordered Mr. Callahan

to the ground as well, and also ordered a fourth person to the ground when he opened the interior

door and stepped onto the porch enclosure.  After overcoming resistance to the order, two

officers then placed that fourth person on the ground.

      Several Task Force officers then conducted a protective sweep of the house trailer

looking for any other suspects in the vicinity.  The Task Force conducted this sweep "to see if

there were any other subjects, make sure that no one was in there with weapons, [so the Task

Force officers] couldn't get hurt."[4]  The four suspects were brought into the house trailer and read

their *Miranda* warnings, but had not yet been arrested.  According to three Task Force officers

---

[3] Jury Trial Transcript I, at 81.

[4] Jury Trial Transcript II, at 82.

and the Utah Court of Appeals, Mr. Callahan then consented to a search of the trailer.  A search of Mr. Bartholomew's person led to a baggie of methamphetamine in his pocket.  The Task Force also found in Mr. Callahan's possession the marked $100 bill issued to Mr. Bartholomew for the methamphetamine purchase.  The Task Force subsequently found drug syringes in Mr. Callahan's house as well.

The Task Force members did not obtain a search or arrest warrant prior to entering Mr. Callahan's enclosed porch or house.  The Task Force argues that no warrants were required because of the rapidly unfolding situation, the time of night, Mr. Callahan's parole status, and the exigent circumstances surrounding the drug transaction.  One of the Task Force officers testified that the legal basis for entering the house was "to secure the persons in the residence . . . [and because] we knew that there was a large quantity of methamphetamine, and we can secure that residence with those people, and either obtain a search warrant from that point or from permission to search."[5]  Because Mr. Bartholomew had "seen so much methamphetamine, [the Task Force officer in charge, Commander Cordell Pearson] didn't want any of it to walk out of there or any of it disposed of prior to [the Task Force] getting into the house after [Mr. Bartholomew] had been there."[6]  And the Task Force officers note that they knew that persons selling drugs in smaller, more rural counties generally disposed of those drugs to their buyers in a quick manner, almost never more than 4-5 hours from the time they first secured the drugs.  The defendants argue that the Task Force reasonably believed that obtaining a search warrant in the

---

[5] Jury Trial Transcript II, at 101.

[6] *Id*. at 103.

short time between the arranged buy and when Mr. Bartholomew first confirmed the availability of drugs would not be timely to ensure the continued existence of the methamphetamine at Mr. Callahan's house.

After the arrest and search, the State of Utah charged Mr. Callahan with possession and distribution of methamphetamine. Mr. Callahan moved to suppress the evidence of methamphetamine and drug paraphernalia. The trial court, however, found that exigent circumstances existed warranting the warrantless search. Mr. Callahan then entered into a conditional plea of guilty reserving the right to appeal his unfruitful motion to suppress.

The Utah Court of Appeals reversed the trial court's decision on the motion to suppress in *State v. Callahan*[7] and reversed Mr. Callahan's conviction. On appeal, the Utah Attorney General's Office conceded that no exigent circumstances existed to justify the warrantless search. Rather, the Utah Attorney General's Office argued an alternative theory that the Task Force officers "inevitably would have discovered the evidence found in [Mr. Bartholomew's] pocket based on their routine and standard police practices."[8] Citing *State v. Topanotes*,[9] the Attorney General's Office contended that even if the Task Force had not illegally entered and searched Mr. Callahan's home, Mr. Bartholomew "would have left the home and presented the Task Force with the methamphetamine."[10]

---

[7] 93 P.3d 103 (Ut. Ct. App. 2004).

[8] *Id*. at 106.

[9] 76 P.3d 1159 (Utah 2003).

[10] *Callahan*, 93 P.3d at 107.

The Utah Court of Appeals held that under the circumstances described it was "not possible to conclude that the evidence would have been discovered through independent, legal avenues."[11]   It therefore concluded that "the evidence from [Mr. Bartholomew's] pocket [was] not admissible pursuant to the inevitable discovery doctrine."[12]  Because of the Attorney General's Office's concession, the Court of Appeals also held that the trial court "erred in justifying the Task Force officers' warrantless entry into [Mr.] Callahan's home under the doctrine of exigent circumstances."[13]  It stated that the "Task Force's adoption of tactics that involve planned illegal entry should not be countenanced, and permitting the use of any evidence found during this situation would provide no deterrent at all to future unlawful detentions, entries, or searches."[14]

Mr. Callahan now brings his claims through a 42 U.S.C. § 1983 action in this court, arguing that the Utah Court of Appeals' decision is the "law of the case."  Because the Utah Court of Appeals found the Task Force violated Mr. Callahan's Fourth Amendment rights, he argues he is entitled to judgment in his favor.  He also seeks remedies for the Task Force's violations of his right to privacy under the Fourteenth Amendment and his "right to personal security as guaranteed by the United States Constitution and protected under 42 U.S.C. § 1983."[15]

---

[11] *Id*. (quotations omitted).

[12] *Id*.

[13] *Id*.

[14] *Id*. (quotations omitted).

[15] Amended Complaint, at ¶¶ 57- 61.

He further argues that the alleged violations of his constitutional rights resulted from the municipal entities' policies or customs and their failure to supervise the Task Force members. Finally, Mr. Callahan brings various state law claims, including wrongful arrest, assault and battery, defamation, intentional infliction of emotional distress, and mislabels "punitive damages" as a cause of action. Mr. Callahan seeks partial summary judgment on the Task Force defendants' liability as a matter of law [#51].

The Task Force defendants respond by contending they are entitled to summary judgment on Mr. Callahan's claims. The Task Force defendants argue that (1) the consent-once-removed doctrine justified the Task Force's warrantless search; (2) Mr. Callahan's parole status gave the Task Force the ability to conduct a warrantless search based solely on reasonable suspicion of criminal activity; (3) Mr. Callahan did not have a reasonable expectation of privacy on his enclosed porch; and (4) exigent circumstances were present, along with probable cause of criminal activity to permit a valid warrantless search. They also argue that even if the court finds their conduct constitutionally deficient, the Task Force defendants are entitled to qualified immunity. And the Task Force defendants seek summary judgment on Mr. Callahan's state law claims, including wrongful arrest, battery, assault, and intentional infliction of emotional distress, through immunity provided by the Utah Governmental Immunity Act.[16]

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no

---

[16] UTAH CODE ANN. §§ 63-30-1 *et seq*.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[17]  The court must view the evidence, and draw reasonable inferences from that evidence, in the light most favorable to the nonmoving party.[18]  The nonmoving party may not, however, "rest on mere allegations or denials of [its] pleading, but must set forth specific facts showing there is a genuine issue for trial."[19]  "The mere existence of a scintilla of evidence in support of the [non moving party's] position will be insufficient [to overcome summary judgment]; there must be evidence on which the jury could reasonably find for [the non-moving party]."[20]

## DISCUSSION

Turning first to Mr. Callahan's motion, it is clear that the "law of the case" doctrine does not preclude this court from examining the issues despite the Utah Court of Appeals' decision. Mr. Callahan's overarching argument primarily consists of the assertion that because the Utah Court of Appeals reversed his conviction and held the search of his residence unconstitutional,[21] his § 1983 suit must prevail.   According to the Tenth Circuit, "[t]he law of the case doctrine obligates every court to honor the decisions of courts higher in the judicial hierarchy."[22]  Given

---

[17] Fed. R. Civ. P. Rule 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Cummings v. Norton*, 393 F.3d 1186, 1189 (10th Cir. 2005).

[18] *Cummings*, 393 F.3d at 1189; *Spaulding v. United States*, 279 F.3d 901, 904 (10th Cir. 2002).

[19] *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).

[20] *Id*. at 252.

[21] *Callahan*, 93 P.3d 103.

[22] *Stifel, Nicolaus & Co. v. Woolsey & Co.*, 81 F.3d 1540, 1543 (10th Cir. 1996) (citing *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1553 (10th Cir. 1991)).

that the respected Utah Court of Appeals is an appellate *state* court, it is not "higher in the

judicial hierarchy" for this federal court.  Accordingly, the Court of Appeals' decision does not

constitute "law of the case."

At the same time, however, it would be foolish to ignore the Utah Court of Appeals'

decision if it considered the same issues between the same parties.  In this vein, the Supreme

Court in *Migra v. Warren City School District Board of Education* noted that "issues actually

litigated in a state-court proceeding are entitled to the same preclusive effect in a subsequent

federal § 1983 suit as they enjoy in the courts of the State where the judgment was rendered."[23]

Under 28 U.S.C. § 1738, it is true that state court judgments "shall have the same full faith and

credit in every court within the United States . . . as they have by law or usage in the court of

such State . . . from which they are taken."  "This statute has long been understood to encompass

the doctrines of res judicata, or "claim preclusion," and collateral estoppel, or "issue

preclusion."[24]  The Supreme Court succinctly defines these two terms:

> Under res judicata, a final judgment on the merits of an action precludes the parties or
> their privies from relitigating issues that were or could have been raised in that action.
> Under collateral estoppel, once a court has decided an issue of fact or law necessary to its
> judgment, that decision may preclude relitigation of the issue in a suit on a different cause
> of action involving a party to the first case.[25]

"A fundamental precept of common-law adjudication, embodied in the related doctrines

of collateral estoppel and res judicata, is that a 'right, question or fact distinctly put in issue and

---

[23] 465 U.S. 75, 83 (1984).

[24] *San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323, 332 (2005).

[25] *Id*. at 332 n.16 (quotations omitted).

directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent

suit *between the same parties or their privies*."[26]  As the Supreme Court noted in *Montana v.*

*United States*, to "preclude parties from contesting matters that they have had a full and fair

opportunity to litigate protects their adversaries from the expense and vexation attending multiple

lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the

possibility of inconsistent decisions."[27]  Preclusion of non-parties to the previous litigation might

"fall[] under the rubric of collateral estoppel" as long as "interests are similarly implicated when

nonparties assume control over litigation in which they have a direct financial or proprietary

interest and then seek to redetermine issue previously resolved."[28]  But collateral estoppel is

specifically reserved for the "persons for whose benefit and at whose direction a cause of action

is litigated" who "cannot be said to be strangers to the cause."[29]

Although Mr. Callahan was a party in *State v. Callahan*, the defendant officers and entity

defendants were not.  Rather, the State of Utah pursued that case.  Mr. Callahan has not alleged,

nor could he reasonably allege, that the Task Force or entity defendants were persons for whose

benefit and at whose direction the previous cause of action was litigated.  Indeed, through their

counsel here, the individual officers vigorously assert arguments that the Utah Attorney

General's Office chose not to pursue.  Because the current defendants were not parties or privies

---

[26] *Montana v. United States*, 440 U.S. 147, 153 (1979) (quoting *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 48-49 (1897)) (emphasis added).

[27] *Montana*, 440 U.S. at 153-54.

[28] *Id*.

[29] *Id*. (quotations omitted).

to the previous litigation, collateral estoppel principles cannot apply to the case before this court. The court will, of course, look to the Utah Court of Appeals' decision for persuasive guidance. But that decision lacks preclusive weight in this case

Turning then to Mr. Callahan's alleged Fourth Amendment violation, the Task Force and municipal defendants argue that no Fourth Amendment constitutional violations occurred, and that if they occurred, they are entitled to qualified immunity.  The court notes that "even defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."[30]  After the U.S. Supreme Court's holding in *Brosseau v. Hagen*,[31] the court must first ask on a qualified immunity issue whether the facts show the Task Force officers' conduct violated a constitutional right.[32]  If the court concludes that a constitutional violation did occur, then the court must undertake an inquiry "in the light of the specific context of the case, not as a broad general proposition" as to whether the right was clearly established.[33] Under this clearly-established prong, the Task Force officers are immune unless "the law clearly

_____

[30] *Davis v. Scherer*, 468 U.S. 183, 190 (1984); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("[T]he qualified immunity defense . . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

[31] 543 U.S. 194 (2004).

[32] *Id*. at 197 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *Simkins v. Bruce*, 406 F.3d 1239, 1241 (2005).

[33] *Saucier*, 533 U.S. at 201.

proscribed the actions" taken.[34]   For this court, in "making this determination, the relevant,

dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted."[35]   Now that the Task Force defendants have raised the

defense of qualified immunity, the burden shifts to Mr. Callahan to show that (a) the Task Force

defendants violated a constitutional right, and, (b) that the right was clearly established at the

time of the Task Force defendant's conduct.[36]

     A.     *The Court Will Assume Mr. Callahan Has Established a Violation of His*
               *Constitutional Rights.*

     The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."[37]   Mr. Callahan argues

that the Utah Court of Appeals reversed his conviction and established that the Task Force

defendants violated his Fourth Amendment rights.   As noted above, this decision by the Utah

Court of Appeals is not the "law of the case" doctrine, nor do collateral estoppel principles apply.

Accordingly, the court must consider the arguments by the Task Force and entity defendants,

who argue that (1) the doctrine of "consent-once-removed" entitled the Task Force to enter Mr.

Callahan's residence; (2) Mr. Callahan was a parolee and therefore his home could be searched to

establish evidence of a parole violation; (3) Mr. Callahan possessed no Fourth Amendment rights

---

    [34] *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985); *see also Meyers v. Redwood City*, 400
F.3d 765, 770 (9th Cir. 2005).

    [35] *Saucier*, 533 U.S. at 202.

    [36] *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998).

    [37] U.S. CONST., amend. IV.

on his screen porch; and (4) exigent circumstances existed to justify the Task Force defendants' warrantless entry.

The defendants' strongest argument appears to be the doctrine of "consent-once-removed."  Under this doctrine, if an undercover agent or informant is given consent to enter a home, in certain circumstances that consent to enter without a warrant can be extended to other law enforcement officers who can provide assistance to that agent or informant.[38]  The consent given to the first person, generally a law enforcement officer but sometimes an informant, is then transferred to the entering police officers once the first person requests assistance from the police based on probable cause.  As described by the Sixth Circuit in *United States v. Pollard*, police officers that have been called to assist a person already in a house may perform a warrantless entry and search if an "undercover agent or informant (1) entered at the express invitation of someone with authority to consent; (2) at that point established the existence of probable cause to effectuate an arrest or search and (3) immediately summoned help from other officers."[39] Therefore, the "consent-once-removed" doctrine applies to the warrantless entry and search by police that are summoned at the behest of the undercover agent or informant.

Besides the Sixth Circuit, the Seventh and Ninth Circuits have embraced this doctrine.[40]

---

[38] *See* WALTER R. LAFAVE, 3 SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 6.1(c) at 290 & n.114 (4th ed. 2004) ("[I]t has frequently been held that no warrant is needed where the arrest is made within premises to which an undercover police officer gained admittance by indicating his interest in participating therein in criminal activity.").

[39] *Pollard*, 215 F.3d 643, 648 (6th Cir. 2000).

[40] *See id*. at 643; *United States v. Bramble*, 103 F.3d 1475 (9th Cir. 1996); *United States v. Akinsanya*, 53 F.3d 852 (7th Cir. 1995); *United States v. Diaz*, 814 F.2d 454 (7th Cir. 1987); *United States v. Paul*, 808 F.2d 645 (7th Cir.1986).

The Seventh Circuit applied the doctrine of "consent-once-removed" to a case in which a government informant received consent to enter an apartment, viewed heroin in the apartment and "immediately summoned the agents, who entered the apartment just as [the informant] was leaving."[41]  That circuit held in *United States v. Akinsanya* that "when [the suspect] gave consent to [the informant] to enter his apartment, he effectively gave consent to the agent with whom [the informant] was working. . . . That consent was not withdrawn simply because [the informant] stepped out of the apartment moments before, or at the same time, the agents entered."[42]  Since at least 1986, the Seventh Circuit has applied the "consent once removed" doctrine to "a confidential informant wearing . . . an alert button."[43]  And the Ninth Circuit in *United States v. Bramble*  "join[ed] the Seventh Circuit in holding that where an undercover agent is invited into a home, established the existence of probable cause to arrest or search, and immediately summons help from other officers, the warrantless entry of the other officers does not violate the Fourth Amendment."[44]  The Tenth Circuit has not, however, spoken on the issue.

The Sixth Circuit adopted the broadened reasoning of the Seventh Circuit recently in *United States v. Yoon*.[45]  In that case, the circuit applied the "consent-once-removed" doctrine to

---

[41] *Akinsanya*, 53 F.3d at 856; *see also United States v. Jachimko*, 19 F.3d 296, 299 (7th Cir. 1994); *Paul*, 808 F.2d at 648.

[42] *Akinsanya*, 53 F.3d at 856.

[43] *Jachimko*, 19 F.3d at 299 (citing *Paul*, 808 F.2d at 648).

[44] 103 F.3d 1475, 1478 (9th Cir. 1996) (citing *Akinsanya*, 53 F.3d at 856 and *Jachimko*, 19 F.3d at 298-99).

[45] 398 F.3d 802, 807 (6th Cir. 2005).

"cases in which a confidential informant enters a residence alone, observes contraband in plain view, and immediately summons government agents to effectuate the arrest."[46]  In that case, a confidential informant engaged in monitored conversations with Mr. Yoon, finally agreeing to purchase 20 pounds of marijuana at Mr. Yoon's apartment.[47]  Upon invitation into the apartment, Mr. Yoon and the informant viewed the marijuana, and the informant then gave a prearranged signal over his radio transmitter to the police officers waiting outside.[48]  The Sixth Circuit held that Mr. Yoon possessed the authority to invite the informant into his residence, also holding that viewing the marijuana "established the necessary probable cause to effectuate an arrest."[49]  The analysis partly rested on the fact that the transaction took place in Tennessee, and that Tennessee is one of the states that grants citizens actual arrest powers.[50]  According to the Sixth Circuit, the warrantless search did not violate Mr. Yoon's constitutional rights because the civilian informant "could have made the arrest himself had he chosen to do so.  Instead, he called officers to assist him, a permissible choice."[51]  As noted above, the Seventh Circuit has reached similar conclusions.[52]

---

[46] *Id* at 808.

[47] *Id*. at 807.

[48] *Id*.

[49] *Id*.

[50] *Id*.

[51] *Pollard*, 215 F.3d 643, 648.

[52] *See Akinsanya*, 53 F.3d 852; *Jachimko*, 19 F.3d 296; *Paul*, 808 F.2d 645; *see also United States v. Diaz*, 814 F.2d 454, 459 (7th Cir. 1987), *cert. denied*, 484 U.S. 857 (1987)

The case before this court is essentially identical to *Yoon*,[53] *Akinsanya*,[54] *United States v. Jachimko*,[55] and *United States v. Paul*.[56]  Mr. Callahan invited the confidential informant, Mr. Bartholomew, into his home to purchase methamphetamine.  Mr. Bartholomew, wired by the Task Force officers, entered the home and purchased drugs.  When Mr. Bartholomew viewed and purchased the methamphetamine, the requisite probable cause for an arrest by the Task Force was established.  And, like the Tennessee state law discussed in *Yoon*, Utah law "recognizes the right of a private person to make a citizen's arrest in narrowly defined circumstances."[57]

Mr. Callahan responds that *Yoon* was decided in 2005, while the search in this case occurred in 2002.  But it is clear that the Seventh Circuit's cases in *Akinsanya*, *Jachimko* and *Paul* were all decided prior to1996, over eight years before the actions took place in this case.  More important, however, this argument misses the main point:  if *Yoon, Akinsanya*, *Jachimko* and *Paul* were correctly decided, then no Fourth Amendment violation ever took place here.

Mr. Callahan also makes the more fundamental argument, however, that *Yoon* and its predecessors are simply incorrect.  He also notes that the Tenth Circuit has not explicitly or

---

(limiting the use of this doctrine to instances in which "the agent (or informant) entered at the express invitation of someone with authority to consent, at that point established the probable cause to effectuate an arrest or search, and immediately summoned help from other officers.").

[53] 398 F.3d 802.

[54] 53 F.3d at 856.

[55] 19 F.3d at 299.

[56] 808 F.2d at 648.

[57] *State v. Quada*, 918 P.2d 883, 886-887 (Utah Ct. App. 1996) (citing Utah Code Ann. § 77-7-3).

implicitly adopted this doctrine.

The court, too, wonders about the grounding of this doctrine. It seems a bit of a stretch to call the kind of police entry that occurred here "consensual." To be sure, Mr. Callahan invited one person – Mr. Bartholomew – into his home. But he did not give Mr. Bartholomew any authority to invite others into his home. The Supreme Court's very recent decision in *Georgia v. Randolph*[58] suggests that the Supreme Court may not be receptive to the doctrine. *Randolph* held that police could not enter a home over Mr. Randolph's objections even though his wife simultaneously gave consent to enter. The Court explained that "[t]his case invites a straightforward application of the rule that a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of the fellow occupant."[59] Thus, if confronted with a case squarely presenting the "consent-once-removed" doctrine, the Supreme Court might well conclude that the objections of an occupant might trump the further warrantless police entry that occurs from an undercover operative or confidential informant originally receiving consent to enter from that occupant.

This is just a prediction about the future, however. Today, the "consent-once-removed" doctrine has been upheld and applied in the Sixth, Seventh, and Ninth Circuits. It has been explicitly applied not only to undercover police agents, but also to government and confidential informants in the Sixth and Seventh Circuits. Ultimately the Supreme Court will have to finally resolve the question of whether the doctrine is consistent with the Fourth Amendment. For

---

[58] 126 S.Ct. 1515 (2006).

[59] *Id.* at 1528.

purposes of resolving this case, the simplest approach is to assume that the Supreme Court will ultimately reject the doctrine and find that searches such as the one in this case are not reasonable under the Fourth Amendment.

B. *Any Violation By Individual Officers Was Not of Clearly-Established Rights.*

Even proceeding on the basis of an assumed violation of constitutional rights, however, the court finds that the individual defendants are all entitled to qualified immunity. Mr. Callahan still bears the burden to demonstrate the "clearly established nature" of any constitutional right that is violated.[60] "A right is 'clearly established' if Supreme Court or Tenth Circuit case law exists on point or if the 'clearly established weight of authority from other circuits' found a constitutional violation from similar actions."[61] In *Saucier v. Katz,* the Supreme Court stressed that "[t]his inquiry must be undertaken in light of the case's specific context, not as a broad general proposition."[62]

The Tenth Circuit in *Holland v. Harrington* extended this inquiry by explaining that an officer is entitled to qualified immunity because of a reasonable police officer's mistake.[63] In evaluating such a reasonableness standard, the circuit stated that "[a] mistake of law may be 'reasonable' where the circumstances 'disclose substantial grounds for the officer to have

---

[60] *Baptiste v. J.C. Penny Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998).

[61] *Murrell v. School Dist. No. 1,* 186 F.3d 1238, 1251 (10th Cir.1999).

[62] *Saucier*, 533 U.S. at 201.

[63] *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1196 (10th Cir. 2001).

concluded he had legitimate justification under the law for acting as he did.'"[64]  Therefore, this court must look to fundamentally similar case law, but it may also examine the reasonableness of the officer's mistake, to determine the "clearly established" nature of the alleged constitutional violations.

Mr. Callahan counters that he has pointed out clearly established law that (1) warrantless searches of a person's home are presumptively unreasonable,[65] (2) there is a heavy burden if entry into a home is involved,[66] (3) that police officers cannot create their own exigent circumstances,[67] and (4) that the State must establish both probable cause and exigent circumstances.[68]  At a general level, this is all true.  But on the specifics of this case, the officers had a reasonable argument that the "consent-once-removed" doctrine justified their actions. Indeed, it is clear that in Sixth, Seventh and Ninth Circuits their actions would have been fully

---

[64] *Id*. (quoting *Saucier v. Katz*, 533 U.S. at 208).

[65] *See Roska v. Peterson*, 328 F.3d 1230, 1240 (10th Cir. 2001) ("It is well-established that a warrantless search is presumptively unreasonable under the Fourth Amendment . . . .").

[66] *See Anderson v. Creighton*, 483 U.S. 635, 668 n.24 (1987) ("It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.") (quotations omitted).

[67] *See United States v. Mikulski*, 317 F.3d 1228, 1233 (10th Cir. 2003) (counseling against the "manufacture of exigencies"); *United States v. Acquino*, 836 F.2d 1268, 1272 (10th Cir. 1988) ("[W]ell-meaning officers may exploit such opportunities without sufficient regard for the privacy interests of the individuals involved.").

[68] *See Cortez v. McCauley*, 438 F.3d 980, 993 (10th Cir. 2006); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1171-72 (10th Cir. 2003) ("It is a basic principle of Fourth Amendment law that searches and seizures inside the home without a warrant are presumptively unreasonable unless the police can show both probable cause and the presence of exigent circumstances.").

consistent with the Constitution.  Put another way, unless and until the Tenth Circuit or the

Supreme Court rejects the "consent-once-removed" doctrine, a police officer in Utah relying on

the doctrine (in a case where the doctrine factually applies) has not violated a clearly established

right.[69]

Finally, it is also worth noting that the Utah trial court and the Utah Court of Appeals

differed on the legality of the search in this case.  The trial court considered all the facts and

circumstances of the case and concluded that the officers faced sufficient exigent circumstances

to justify warrantless entry into the home.  The trial court cited the presence of a very dangerous

drug – methamphetamine – and the possibility of quick disposal of the drugs as creating exigent

circumstances.  To be sure, the Utah Court of Appeals differed with the trial court after the Utah

Attorney General's Office declined to defend that position.  Without agreeing with the final legal

conclusion of the trial court,[70] it certainly provides considerable evidence that the actions of the

officers in this case were not in violation of clearly-established rights.

*C. The Entity Defendants Are Entitled to Summary Judgment.*

Mr. Callahan's suit against the entity defendants relies on claims that these defendants

implemented unconstitutional official polices or customs as the catalyst to Mr. Callahan's

injuries.  Additionally, Mr. Callahan claims that the entity defendants failed to properly train the

Task Force defendants, thereby causing his constitutional injuries.

---

[69]  In light of this conclusion, the court need not reach the arguments raised by the defendants as to the justifications for their actions.

[70] *Cf. Brigham City v. Stuart*, 126 S.Ct 979 (2006), *granting certiorari to review Brigham City v. Stuart*, 122 P.3d 506 (Utah 2005) (finding no exigent circumstances to justify warrantless entry).

The court recognizes no respondeat superior liability under § 1983 for municipal entities.[71]  To survive summary judgment, Mr. Callahan must show that the entity took its municipal action "with the requisite degree of culpability and must demonstrate a causal link between that action and the deprivation of federal rights."[72]  In order to impose supervisor liability under § 1983, it is not enough for [Mr. Callahan] merely to show [the entity defendants were] in charge of other state actors who actually committed the violation.  Rather, [Mr. Callahan] must establish a deliberate, intentional act by the supervisor to violate constitutional rights. [Mr. Callahan] may satisfy this standard by showing the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance."[73]

Mr. Callahan has failed to point to any official policy or custom implemented, or not implemented, by the entity defendants which led to the violation of Mr. Callahan's rights.  Mr. Callahan has also pointed to no arguable facts in the record which demonstrate the entity defendants' failure to train.  In fact, the entity defendants demonstrate that each of the Task Force defendants have been properly certified to perform police work in the state, and also demonstrate that the entity defendants held bi-annual meetings to discuss the supervision of the Task Force. Therefore, Mr. Callahan's § 1983 claims against the municipal entities for their implementation of policies or customs, or their lack of policies or customs, fails.  And, particularly given the

---

[71] *See Cannon v. City and County of Denver*, 998 F.2d 867, 877 (10th Cir. 1993); *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 680 (1978).

[72] *Bd of County Commr's v. Brown*, 520 U.S. 397, 404 (1997).

[73] *Beedle v. Wilson*, 422 F.3d 1059, 1074 (10th Cir. 2005).

recognition of the "consent-once-removed" doctrine in several circuits, the court cannot find any municipal entity liability either under Mr. Callahan's failure to supervise and train § 1983 claims. Accordingly, the court finds this claim ripe for summary judgment as well.

   *D. Mr. Callahan's State Law Claims*

   Having granted summary judgment to the Task Force and entity defendants on Mr. Callahan's federal claims, the court declines to exercise supplemental jurisdiction on any of Mr. Callahan's state law claims.  Although both sides make arguments regarding the Utah Governmental Immunity Act and its application to this case, the court declines to consider these arguments, as they are best resolved in Utah courts.  Accordingly, the court dismisses these claims without prejudice.

**CONCLUSION**

   Given the foregoing discussion, the court GRANTS the defendants' motion for summary judgment [#61] and DENIES Mr. Callahan's motion for partial summary judgment [#52].  The federal law claims are dismissed with prejudice.  The state law claims are dismissed without prejudice.  The Clerk's Office is directed to close this case.

   DATED this 18th day of May, 2006.

                                        BY THE COURT:

                                        _____
                                        Paul G. Cassell
                                        United States District Judge